IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Bobby C. Jenkins,<br>                          Plaintiff,<br><br>  v.<br><br>Dr. McRee; Dr. Lewis; RN Harper; NP Enloe; Terry L.<br>Andrews, Nurse Admin II; Sam Soltis; Maria Leggins; and<br>Janice Phillips,<br><br>                         Defendants. | ) C/A No. 5:14-02711-RMG-KDW<br>)<br>)<br>)<br>)   Report and Recommendation<br>)<br>)<br>)<br>)<br>)<br>) |

Plaintiff, an inmate with the South Carolina Department of Corrections ("SCDC"), filed this 42 U.S.C. § 1983 action alleging Defendants violated his constitutional rights. This matter is before the court on Defendants' Motion for Summary Judgment. ECF No. 113. As Plaintiff is proceeding pro se, the court entered a *Roseboro* order[1] on May 27, 2015, advising Plaintiff of the importance of such a motion and of the need for him to file an adequate response. ECF No. 114. Plaintiff filed a Response in Opposition to Defendants' Motion for Summary Judgment on July 14, 2015, ECF No. 130, to which Defendants replied on July 23, 2015, ECF No. 135. This case was referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Civil Rule 73.02(B)(2)(d) and (e), D.S.C. Because the Motion is dispositive, a Report and Recommendation is entered for the court's review.

I.      Background

Plaintiff Bobby C. Jenkins is currently incarcerated at SCDC's Perry Correctional Institution ("PCI"). ECF No. 1 at 2. Plaintiff's Complaint mainly concerns problems related to

---

[1] The court entered a "*Roseboro* order" in accordance with *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975) (requiring that the court provide explanation of dismissal/summary judgment procedures to pro se litigants).

his genitalia. While at McCormick Correctional Institution, in May of 2011, Plaintiff reported to medical complaining of a swollen penis/scrotum. *Id.* at 5; 17. Plaintiff alleges that following unsuccessful conservative institutional treatment for "cellulitis," on July 25, 2011, he was taken to an outside clinic in Sumter, SC for a circumcision. *Id.* Plaintiff maintains that he developed complications from the circumcision surgery, including back pain, blood in stool, and excessive fluid throughout body. *Id.* at 5. However, Plaintiff alleges that Dr. Zubel, an outside urologist, refused to re-operate "for six months." *Id.* Plaintiff maintains that SCDC authorized a CAT scan "of [his] private," and, thereafter, the urologist told him that he needed to see a dermatologist. *Id.* at 6. Plaintiff was transferred to PCI in October 2011. *Id.*

According to Plaintiff, PCI officials never set up an appointment with the dermatologist, and started tampering with his mail and grievances in retaliation for his family calling about his medical condition. *Id.* at 6-7.[2] However, Plaintiff represents he eventually saw an outside dermatologist, Dr. Bradford, and after an examination Dr. Bradford told Plaintiff there was nothing he could do at that point—that Plaintiff should see plastic surgeon, GI specialist, and/or vein specialist. *Id.* at 8. Later, Plaintiff maintains he had an additional surgery by Dr. Lee, a urologist, on his penis. *Id.* at 11.

After the second surgery, Plaintiff maintains he went to see a plastic surgeon, and the plastic surgeon explained to Plaintiff that he had scar tissue and recommended Plaintiff not have additional surgery or he would lose all erection ability. *Id.* at 11-12. After continuing to experience problems, Plaintiff represents that he saw Dr. Lee again, but Dr. Lee told Plaintiff there was nothing urology could do so Plaintiff should go to a "MUSC dermatologist." *Id.* at 12.

---

[2] Mail tampering and other access to court claims were the subject matter of Civil Action No. 5: 14-cv-02708-RMG.

Plaintiff maintains that he finally saw Dr. Khan, a dermatologist, at MUSC, who told Plaintiff something could be done by a urologist, not by a dermatologist. *Id.* at 12-13. According to Plaintiff, his medical conditions have made him depressed and have forced him to seek mental health care. *Id.* at 7-8. Additionally, he claims that he "lost [his] manhood" because SCDC staff did not follow instructions "in the early part of [his] incarceration." *Id.* at 8.

In what appears to be a separate health issue, Plaintiff alleges that he went to a Gastro-Intestinal specialist for upper and lower GI issues and learned that he has "diverticula" in his colon, "gastris," and internal and external hemorrhoids. *Id.* at 9. Plaintiff maintains that he continues to bleed, but that Dr. Lewis ("Defendant Lewis") and Nurse Enloe ("Defendant Enloe") tell him to keep taking the medications rather than sending Plaintiff back to a specialist. *Id.*

Plaintiff also complains of knee, back, and neck pain from an alleged excessive force incident. *Id.* at 10. Plaintiff contends that Defendant Harper "told the Warden all them lies saying [his] results showed nothing but [he] got a request from him saying [his] cervical spine was diagnose (sic) degenerative cervical spormlosis (sic) and [his] left knee previous ACL repair + degenerative arthopatyalsattetenal (sic) patel joint space and bone spairs (sic)." *Id.* Plaintiff maintains that he is in constant pain and has had no therapy since he came to lock-up. *Id.*

Plaintiff maintains he is bringing suit under the Americans with Disabilities Act ("ADA")[3] and for medical malpractice, deliberate indifference to serious medical needs, and "federal tort for the private doctors."[4] *Id.* at 3. In a separate complaint form, Plaintiff maintains

---

[3] As part of his argument related to tolling of any statute of limitations Plaintiff appears to allege that because he has a mental illness and is in restrictive confinement he is "clearly disable[d]" under the ADA. ECF No. 1 at 14-15.

[4] The private doctors were dismissed from this action on October 31, 2014. ECF No. 35.

he is bringing suit for "deliberate indifference, negligence, cruel and [un]usual punishment, [and] due process." *Id.* at 4. Plaintiff requests that SCDC give him the proper medical treatment and medication, stop charging him for medications, and send him "to a doctor that knows what needs to be done." *Id.* at 16. Additionally, Plaintiff seeks $300,000 in compensatory damages, $500,000 in punitive damages, a jury trial, costs, and any additional relief the court deems proper. *Id.*

II.     Standard of Review

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Further, while the federal court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, *see, e.g., Cruz v. Beto*, 405 U.S. 319 (1972), the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts that set forth a federal claim, nor can the court assume the existence of a genuine issue of material fact when none exists. *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387 (4th Cir. 1990).

III.     Analysis

A.  Failure to State a Claim under § 1983

Defendants maintain that Plaintiff's action against Defendant Andrews should be dismissed because the Complaint fails to state a claim against her. ECF No. 113-1 at 1-3. Additionally, Defendants assert that "[i]n the present case, the Plaintiff has failed to assert facts

4

concerning Defendant Andrews which are sufficient to state a constitutional claim." *Id.* at 2. Specifically, Defendants argue that Plaintiff "mentioned Defendant Andrews only once in his Complaint stating that he wrote to [Defendant] Andrews that he felt his medical care was being neglected and shortly thereafter he was taken to Kirkland Infirmary and seen by Dr. Zubel." *Id.* at 3. In addressing "Argument I" in his Response, Plaintiff maintains that "according to the request that Plaintiff wrote telling her he was bleeding from his rectum and had blood in his stool. Plaintiff also complained to [Defendant] Andrews about his private and wanting to see a dermatologist about his problem but was never rescheduled and was shipped to [PCI]." ECF No. 130-1 at 1-2. Moreover, Plaintiff maintains that every time he requested an appointment with a dermatologist, he was ignored "before this los[s] of use of his private and pain as well as well (sic) as suffering he is going through that cannot be fixed or corrected through surgery or medication." *Id.* at 5.

Rule 8 of the Federal Rules of Civil Procedure requires that complaints shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The purpose behind Rule 8 is to give the defendant fair notice of the claims and the grounds upon which it rests. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Further, the plaintiff is obligated to provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. . . ." *Id.* The factual allegations must be enough to raise a right to relief above the speculative level. *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The *Twombly* Court noted that defendants will not know how to respond to conclusory allegations, especially when "the pleadings mentioned no specific time, place, or person involved in the alleged conspiracies."

5

*Twombly*, 550 U.S. at 565 n.10. However, *Twombly* did not expressly hold that a plaintiff must assert specific time, place, and persons involved in order to comply with Rule 8. *See Ashcroft*, 556 U.S. at 678 (internal *Twombly* citation omitted) ("As the Court held in *Twombly,* [] the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."); *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010) (finding the *Twombly* court noted, in dicta, that the pleadings there mentioned no specific time, place, or person involved in the alleged conspiracies and rejected defendants' argument that *Twombly* requires a plaintiff identify the specific time, place, or person related to each conspiracy allegation); *Milliken & Co. v. CNA Holdings, Inc.*, 3:08-CV-578-RV, 2011 WL 3444013, at *5 (W.D.N.C. Aug. 8, 2011) (finding other courts have held a plaintiff can survive a motion to dismiss even though he fails to answer who, what, when and where).

Plaintiff is proceeding pro se in this case. Pro se complaints should be construed liberally by this court and are held to a less stringent standard than those drafted by attorneys. *Estelle v. Gamble,* 429 U.S. 97, 105 (1976). Dismissal of a pro se complaint for failure to state a valid claim is only appropriate when, after applying this liberal construction, it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Haines v. Kerner,* 404 U.S. 519 (1972). The requirement of liberal construction, however, does not mean that the court can ignore a clear failure in the pleading to allege facts which set forth a claim currently cognizable in a federal district court. *See Weller*, 901 F.2d at 390-91. Liberally construing Plaintiff's Complaint, the undersigned finds that Plaintiff has alleged enough facts to withstand dismissal of his claims against Defendant Andrews under Rule

8. *See* ECF No. 1 at 5. Therefore, the undersigned will consider Defendants' remaining arguments under the summary judgment standard of review.

### B.  Matters Outside Scope of § 1983

Defendants maintain that Plaintiff's Complaint should be dismissed because the matters asserted by the Plaintiff do not fall within the scope of 42 U.S.C. § 1983. ECF No. 113-1 at 1-3. Furthermore, Defendants argue that medical malpractice is not a cognizable § 1983 claim, and the facts of this case are analogous to those in *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). In his Response, Plaintiff concedes that mere medical malpractice does not violate the Eighth Amendment. ECF No. 130-1 at 10-11. However, Plaintiff maintains that "[a]s a result of [Defendant] McRee['s] deliberate indifference of Plaintiff['s] medical needs, gross negligence and cruel and unusual punishment[,] Plaintiff suffered a permanent injury that can never be fixed along with pain for the rest of his life." *Id.* at 14. Further, Plaintiff argues that excessive delays in medical treatment can be a basis for a §1983 cause of action. *Id.* Moreover, Plaintiff maintains that every time he requested an appointment with a dermatologist, he was ignored "before this los[s] of use of his private and pain as well as well (sic) as suffering he is going through that cannot be fixed or corrected through surgery or medication." *Id.* at 5. Plaintiff maintains that according to the CRT[5] Defendant McRee examined Plaintiff before May 23, 2011, and Plaintiff repeatedly asked "to be rescheduled to see the dermatologist in which the urology clinic suggested back in the middle of 2000 according to medical documents and the CRT." *Id.* at 23. Plaintiff represents that he informed Defendants Andrews and McRee that the creams given to

---

[5] The CRT is SCDC's automated grievance system. *See Brown v. West*, No. 4:14-cv-4732-TLW, 2015 WL 4162457, at *3 (D.S.C. July 9, 2015) (citing to affidavit of SCDC Inmate Grievance Administrator who attested he had "access to SCDC's Automated CRT System whish records inmate grievances").

treat his condition were not working and as a result of the treatment and surgery "Plaintiff has lost function of his limb. . . [and] he can only get a partial erection that cause[s] pain." *Id.* Plaintiff specifically maintains that Defendant Andrews caused this injury "by not following what urology clinic suggested back in the early part of the 2000s." *Id.* at 24. Further, Plaintiff argues that Defendant McRee never told Plaintiff he could refuse this procedure or discussed the risk of the surgery. *Id.*

To prevent the entry of summary judgment on a cause of action for deliberate indifference to medical needs, a plaintiff must present evidence sufficient to create a genuine issue of fact that the defendant was deliberately indifferent to his serious medical need. *Farmer v. Brennan*, 511 U.S. 825, 832-35 (1994); *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). Deliberate indifference to a serious medical need requires proof that each defendant knew of and disregarded the risk posed by the plaintiff's objectively serious medical needs. *Farmer*, 511 U.S. at 846. In other words, a plaintiff must allege facts demonstrating that defendant's actions were "[s]o grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Id*. The Fourth Circuit Court of Appeals defines a serious medical need as "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreye*, 535 F.3d 225, 241 (4th Cir. 2008) (internal citation omitted). A medical condition is also serious if a delay in treatment causes a lifelong handicap or permanent loss. *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).

Here, Plaintiff admits to receiving medical treatment on numerous occasions and receiving medications for issues related to his genitalia. Specifically, Plaintiff represents that he

underwent circumcision surgery and corrective surgery. Further, Plaintiff represents that he has

seen by an outside urologist, dermatologist, and plastic surgeon. Therefore, the undersigned finds

that Plaintiff has failed to allege that he has suffered from a serious medical injury for which he

received *no* medical treatment. However, Plaintiff appears to allege that he suffered from a

serious medical condition, and his treatment was *delayed*. Specifically, Plaintiff appears to allege

that SCDC staff delayed sending him to a dermatologist.   The undersigned has thoroughly

reviewed all of Plaintiff's medical encounters submitted to the court and finds there is no

evidence of a delay in medical treatment that exacerbated an existing medical condition or led to

a permanent loss.

Upon entering SCDC in 2000, Plaintiff underwent a physical examination, and

physicians ordered that Plaintiff apply Lotrimin cream to his groin area. ECF No. 130-3 at 57-58.

In a January 11, 2001 medical encounter, Plaintiff reported swelling and edematous was noted

upon examination of Plaintiff's penis. *Id.* at 56. Thereafter, Plaintiff was seen by the urology

clinic on several occasions. *See* Medical Encounters 11, 12, 13, 19, 20, 21, 70, 71 at ECF No.

130-3 at 48-49, 53-55. Medical encounter 12 indicates that Plaintiff returned from the urology

clinic "with recommendations to start antibiotic therapy." ECF No. 130-3 at 55. Medical

encounter 74 indicates that Plaintiff had a dermatology appointment scheduled for December 16,

2002, signed off on by Defendant Andrews and Dr. Langston. *Id.* at 48. However, medical

encounters 76 and 77 indicate that Plaintiff refused to go to this appointment and returned to

medical services to reschedule the appointment.  *Id.* at 47. Plaintiff returned to the medical clinic

several times thereafter, and medical encounter 86 indicates that Defendant Andrews was "attempting to get approval for dermatology." *Id.* at 45.[6]

After his surgery, there is no evidence of a medical opinion indicating Plaintiff needed a dermatological consultation until October 28, 2011. ECF No. 113-11 at 6. Specifically, medical encounter 425 indicates the Kirkland Correction Institution's urology clinic recommended Plaintiff "see a dermatologist for another opinion on genital edema." *Id.* After the consultation was recommended, Plaintiff saw a dermatologist who recommended Plaintiff see a different type of specialist. *Id.* at 4. To the extent Plaintiff maintains that he should have seen a dermatologist rather than a urologist, such a claim is more akin to a medical malpractice. Similarly, to the extent Plaintiff maintains that Defendant McRee did not inform Plaintiff of the consequences of surgery, such a claim is also more akin to medical malpractice, and not a deliberate indifference to serious medical needs. Plaintiff's argument that Defendant Andrews delayed sending him to a dermatologist in the early 2000's is belied by the medical encounter records which indicate Defendant Andrews' attempts to schedule Plaintiff appointments with dermatology.

In *Estelle*, the Supreme Court held that "a complaint that a physician had been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." 429 U.S. at 106. An assertion of mere negligence or malpractice is not enough to state a constitutional violation, plaintiff must allege and demonstrate "[d]eliberate indifference. . . by either actual intent or reckless disregard." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837. However, a difference of medical opinion is insufficient to establish deliberate

---

[6] The undersigned notes that Plaintiff omitted several medical encounters from his filing to the court.

indifference."); *Brown v. Thompson*, 868 F. Supp. 326 (S.D. Ga. 1994) (finding that although the provision of medical care by prison officials is not discretionary, the type and amount of medical care is discretionary).  As the Fourth Circuit Court of Appeals articulated:

> Negligence or malpractice in the provision of medical services does not constitute a claim under § 1983. The standard for § 1983 liability is deliberate indifference to serious medical needs. Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged.

*Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (internal citations omitted).

Attached to Defendants' Motion are affidavits and Plaintiff's medical records beginning in February 2010. These affidavits and records give a history of Plaintiff's more recent medical treatment, including his circumcision surgery, follow-up surgery, and consultations with specialists following the surgeries. In his affidavit to the court Defendant McRee, the physician assigned to McCormick Correctional Institution ("MCI"), attests that he saw Plaintiff on May 23, 2011, while Plaintiff was still housed at MCI. ECF No. 113-5 at ¶¶ 2-4. After examining Plaintiff's scrotal area on May 23, 2011, Defendant McRee avers that he diagnosed Plaintiff with an infection and prescribed Cirpo, an antibiotic. *Id.* at ¶ 4. Defendant McRee represents he saw Plaintiff again on June 17, 2011, and prescribed Plaintiff Nystatin and Triamcinolone and ordered Plaintiff be seen by an urologist for a possible circumcision. *Id.* at ¶ 5.

According to Defendant McRee's affidavit, Plaintiff was seen by an outside urologist on July 1, 2011, and he was approved to have a circumcision. *Id.* at ¶ 6. Plaintiff had the circumcision procedure on July 26, 2011. *Id.* at ¶¶ 6-7. After his surgery, Plaintiff saw nursing personnel on July 27, 2011 and August 3, 2011. *Id.* at ¶ 7. Plaintiff returned to the urology clinic on August 4, 2011 and August 18, 2011, for follow-up visits. *Id.* at ¶ 8. Plaintiff returned to the urology clinic on September 22, 2011, and there they recommended Plaintiff have a CT scan of

the abdomen and pelvis and follow-up after the CT scan. *Id.* at ¶ 10. SCDC approved the recommendation that Plaintiff have a CT scan, and it was scheduled for October 19, 2011. *Id.* Dr. McRee attests that Plaintiff was transferred to PCI on October 11, 2011. *Id.* A review of Plaintiff's medical records confirm Defendant McRee's representations regarding the chronology and assertions regarding Plaintiff's medical treatment. ECF No. 113-11 at 6-15.

According to Defendant Enloe's affidavit, Plaintiff was seen several times by Defendant Enloe once he arrived at PCI on October 11, 2011. *See* ECF No. 113-2. Defendant Enloe attests that Plaintiff "was unable to go for the CT scan of the abdomen and pelvis at Image Care on October 19 because he had just transferred to [PCI] and there was a transportation conflict." *Id.* at ¶ 5. However, Plaintiff's appointment was rescheduled for Anderson radiology. *Id.* Defendant Enloe first saw Plaintiff on October 25, 2011 for "acid reflux and right flank pain," and she prescribed him Zantac and ordered several tests be completed. *Id.* at ¶ 6. Thereafter, Plaintiff returned to the urology clinic on October 27, 2011, and the clinic recommended that Plaintiff be seen by a dermatologist. *Id.* at ¶ 7. On November 8, 2011, Plaintiff was seen by the dermatologist and it was recommended that Plaintiff see a regular surgeon, plastic surgeon, or to consult with a genital urinary specialist. *Id.* at ¶ 8. Defendant Enloe prepared a consult for Plaintiff, and the SCDC Medical Director approved a consult for the Plaintiff with a surgeon. *Id.* at ¶¶ 9-10. Plaintiff was seen at the surgery clinic on November 17, 2011, and the surgeon stated that they did not address penile issues and recommended that Plaintiff be seen either by a urologist or a plastic surgeon. *Id.* at ¶ 10.

Defendant Enlow avers:

[She] next saw the Plaintiff on December 6, 2011. Plaintiff at that time was complaining of back pain stating he had had no injury and it had been ongoing since he arrived at Perry. He also complained of difficulty in swallowing stating

that "police hurt neck years ago" and it just started bothering him when he arrived at Perry. He also complained of circulation problems in his arms. He stated that he was doing 2,000 push-ups per day and worked out two hours per day. Plaintiff was in no apparent distress and his gait was within normal limits. He had a small bruise on his right hand, but there was no swelling and he was not tender to palpation. He also had full range of motion in his back and was not tender to palpation to his lumbar spine. He also appeared to be swallowing without difficulty. [She] ordered x-rays of the lumbar and cervical spine and instructed Plaintiff to decrease the amount of exercise to let his hand and back issues resolve. [She] also prescribed an anti-inflammatory.

*Id.* at ¶ 11.

Plaintiff was seen by the plastic surgeon on December 13, 2011, and the plastic surgeon requested that various laboratory tests be completed. *Id.* at ¶ 12. Defendant Enloe attests that she ordered the tests be completed and made a note to wait to hear back from the plastic surgeon concerning surgery. *Id.* Plaintiff had a colonoscopy completed on January 20, 2012, and returned with a recommendation for an EGD (Esophagogastroduodenoscopy). *Id.* at ¶ 13. Defendant Enloe represents that nursing personnel contacted the plastic surgeon's office on January 24, who acknowledged that they had received the laboratory results and CT, but the physician had not made a determination at that point whether surgery would be done. *Id.* at ¶ 14.

After nursing personnel contacted the surgeon's office several more times, on March 14, 2012, the plastic surgeon's office contacted SCDC and stated that they would go forward with surgery, and Defendant Enloe attests that she submitted the consult for approval of the procedure. *Id.* at ¶ 14. Defendant Enloe attests that the EGD was completed on March 2, and Plaintiff was diagnosed with gastritis—inflammation of the stomach lining. *Id.* at ¶ 15. Defendant Enloe avers that because Plaintiff was already taking Zantac, no additional treatment was necessary at that time. *Id.* Defendant Enloe represented that she approved Plaintiff's request to change from Zantac to Prilosec, a different antacid. *Id.*

13

Defendant Enloe maintains that Plaintiff was seen at the urology clinic on March 22 and returned with a recommendation for surgery which had already been scheduled. *Id.* at ¶ 16. The surgery was completed on March 27, 2012, and Plaintiff was admitted to the Kirkland Infirmary following the surgery where Plaintiff remained until April 4, 2012. *Id.* After Plaintiff complained to Defendant Lewis about continuing problems from the circumcision, Dr. Lewis submitted a consult for him to be seen again by the plastic surgeon. *Id.* at ¶ 19. Thereafter, "Plaintiff was seen by the plastic surgeon on April 29, 2013, who stated that there was nothing further they had to offer and recommended that the Plaintiff follow-up with urology." *Id.* Defendant Enloe attests that she then submitted a request for Plaintiff to have a follow-up appointment with the urology clinic, and on May 16, 2013, Plaintiff was seen at the urology clinic where urology staff stated they had no answer or further treatment they could offer the Plaintiff. *Id.* Plaintiff had a return visit with Defendant Lewis on July 23, 2013 complaining of continuing pain from the circumcision and subsequent revision. *Id.* at 20. Plaintiff was seen at the urology clinic on November 21, 2013, and returned with a recommendation that he be prescribed Ultram and that the only other option would be to refer the Plaintiff to MUSC for another opinion. *Id.* at 21.

Defendant Enloe avers that she saw Plaintiff on January 22, 2014, and Plaintiff had various complaints and requested a follow-up appointment with a specialist concerning his circumcision. *Id.* at 23. In response, Defendant Enloe represents that she submitted a consult for the Plaintiff to be seen by a specialist at MUSC. *Id.* Additionally, Defendant Enloe avers:

> Plaintiff was seen on April 3, 2014, by the dermatology clinic at MUSC for complaints relating to the edema or swelling to his penis. They noted there were surgical changes with the edema and scarring and stated there was no medical therapy or treatment they could offer for his condition. The dermatologist stated that the swelling and pain was likely due to post-surgical changes and scarring and any potential treatment would be surgical. They recommended referral to the MUSC urology clinic, and [she] submitted a consult request for this appointment.

14

*Id.* at ¶ 26. On July 17, 2014, Plaintiff was scheduled for and was transported to MUSC urology for evaluation, but upon arrival, officers were informed that Plaintiff's appointment had been canceled. *Id.* at ¶ 28. Plaintiff was seen by the MUSC urology clinic on August 26, 2014. *Id.* at ¶ 29. He returned with a diagnosis of mild lymphedema to the distal shaft of the penis, which essentially means fluid buildup. *Id.* MUSC recommended that Plaintiff wear brief type underwear and not have additional surgery as this would only worsen his condition. *Id.* Defendant Enloe avers that she complied with the recommendation and instructed nursing personnel to inform Plaintiff of the recommendation and was able to obtain the briefs for Plaintiff. *Id.*

Turning to Plaintiff's allegations that Defendants were deliberately indifferent to his knee, back, and neck pain, the undersigned finds that the medical evidence and affidavits submitted to the court also indicate that over the years Plaintiff received treatment for these medical conditions. *See* ECF No. 130-3 at medical encounters 14, 15, 138, 139, 140, 169, 170, 172, 177, 257, 258. Medical encounter 145 indicates that Plaintiff returned from an orthopedic appointment with recommendations "to continue naprosen, continue using neoprene knee sleeve (issued 11/1/04) warm up exercises prior to activities ankle/knee/hip flexibility, without sign or symptoms of distress, stable." ECF No. 130-3 at 40.

In his affidavit to the court, Defendant McRee attests that Plaintiff's medical records indicate he was involved in an altercation with another inmate on August 29, 2011, and complained of knee pain. ECF No. 113-5 at ¶ 9. Defendant McRee avers that Plaintiff was seen by nursing personnel who stated there was no swelling noted to his knee though he did have swelling to other areas, and Plaintiff was given Tylenol and Motrin for pain and inflammation.

*Id.* Defendant McRee further attests that Plaintiff was escorted back to the holding cell, and it was noted that he was ambulating with a steady gait. *Id.*

> In her affidavit, Defendant Enloe attests:
>
> [She] saw the Plaintiff on December 6, 2011. Plaintiff at that time was complaining of back pain stating he had had no injury and it had been ongoing since he arrived at Perry. He also complained of difficulty in swallowing stating that "police hurt neck years ago" and it just started bothering him when he arrived at Perry. He also complained of circulation problems in his arms. He stated that he was doing 2,000 push-ups per day and worked out two hours per day. Plaintiff was in no apparent distress and his gait was within normal limits. He had a small bruise on his right hand, but there was no swelling and he was not tender to palpation. He also had full range of motion in his back and was not tender to palpation to his lumbar spine. He also appeared to be swallowing without difficulty. [She] ordered x-rays of the lumbar and cervical spine and instructed Plaintiff to decrease the amount of exercise to let his hand and back issues resolve. [She] also prescribed an anti-inflammatory.

ECF No. 113-2 at ¶ 11. Defendant Enloe saw Plaintiff again on August 8, 2012, when he requested Ensure, a dietary supplement, a multivitamin, and complained of back pain, but stated that he was working out daily. *Id.* at ¶ 18. Defendant Enloe attests that she prescribed the Plaintiff Nortriptyline for nerve pain and Methocarbamol, a muscle relaxer. *Id.* Defendant Enloe avers that she saw Plaintiff again on February 15, 2013, when he requested an increase in the dosage of Neurontin and Baclofen, a muscle relaxer, in place of Methocarbamol. *Id.* Defendant Enloe represented that "Plaintiff complained of pain, but stated that he worked out every day and appeared to be very fit and muscular [but noted that] [h]e did not appear to be in any apparent distress and his gait was within normal limits." *Id.*

Defendant Enloe attests that Plaintiff was seen by Defendant Lewis on July 23, 2013, with complaints of low back pain and pain in both feet, and Defendant Lewis ordered x-rays of Plaintiff's feet. *Id.* at ¶ 20. The x-rays were scheduled to take place on August 28, 2013, but Plaintiff refused treatment on that day and the x-rays were rescheduled. *Id.* Defendant Enloe

represents that "[t]he x-rays showed postoperative changes of a prior anterior cruciate ligament repair with degenerative arthropathy, joint disease." *Id.* Consequently, Defendant Enloe attests that she submitted a consult on September 9, 2013 requesting Plaintiff be seen by an orthopedist to evaluate his left knee. *Id.* Defendant Enloe further attests that:

> Plaintiff was seen by the orthopedic clinic on December 4, 2013. He returned with a recommendation for Naprosyn, physical therapy for strengthening and range of motion, and was issued a neoprene knee sleeve. The orthopedic clinic also recommended a follow-up in three months. [She] reviewed the encounter and noted that the Plaintiff already had a pass for the Theraband to use for physical therapy. [She] prescribed Mobic and submitted a request for approval of the follow-up appointment with the orthopedic clinic. [She] would also note that over approximately the next month and a half, there were at least 10 occasions where Plaintiff failed to show for physical therapy.

*Id.* at ¶ 22. Thereafter, Defendant Enloe attests that Plaintiff was seen by the orthopedic clinic with recommendations that he continue taking Tylenol, continue normal activity, continue strengthening his leg and to return in four months. *Id.* at ¶ 24. Defendant Enloe attests that she saw the Plaintiff again on March 20, 2014, and Plaintiff complained of neck and back pain and left arm numbness that he claimed was a result of a use of force which occurred in February. *Id.* Defendant Enloe represents that Plaintiff was in no apparent distress and his gait was within normal limits, and he was able to get off and on the exam table without difficulty. *Id.* Defendant Enloe avers that she ordered x-rays of both the cervical and lumbar spine and prescribed Prednisone. *Id.* Defendant Enloe attests that Plaintiff returned to the orthopedic clinic on July 28, 2014, and it was recommended that "Plaintiff continue physical therapy and exercise as tolerated and return in three months if symptoms continued." *Id.* at ¶ 29.

The undersigned finds that Plaintiff's Complaint fails to contain facts that, if true, demonstrate Defendants knew of and disregarded Plaintiff's serious medical needs or delayed Plaintiff's access to medical care. Rather, a review of the evidence demonstrates that Plaintiff has

received consistent care and has not experienced delays in medical treatment that have led to a lifelong handicap or permanent loss. Specifically, the undersigned finds that the medical conditions concerning Plaintiff's penis and his orthopedic conditions were addressed and treated. Accordingly, the undersigned recommends that Plaintiff's medical indifference claim be dismissed.[7]

C.     Qualified Immunity

Defendants assert that they are entitled to qualified immunity because their conduct did not violate any clearly established constitutional or statutory rights of which a reasonable person would have known. ECF No. 113-1 at 25-27. The Supreme Court in *Harlow v. Fitzgerald* established the standard that the court is to follow in determining whether a defendant is protected by this immunity. That decision held that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow*, 457 U.S. 800, 818 (1982).

When evaluating a qualified immunity defense, the court must determine (1) whether the facts alleged, taken in the light most favorable to the plaintiff, show that the defendants' conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 230-33 (2009). The two prongs of the qualified immunity analysis may be addressed in whatever order is appropriate given the circumstances of the particular case. *Id.* at 236. In determining whether the right violated was

---

[7] Though the analysis in section two mainly concerns Defendants McRee and Enloe, the undersigned finds that Plaintiff has failed to demonstrate any Defendant, including Defendants Soltis, Leggins, and Phillips, were deliberately indifferent to his medical needs. Therefore, the undersigned recommends that Plaintiff's cause of action for deliberate indifference be dismissed with prejudice for all named Defendants.

18

clearly established, the court defines the right "in light of the specific context of the case, not as a broad general proposition." *Parrish v. Cleveland*, 372 F.3d 294, 301-03 (4th Cir. 2004). "If the right was not clearly established in the specific context of the case—that  is, if it was not clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted—then the law affords immunity from suit." *Id.* (citations and internal quotation omitted).

The record before the court shows that these Defendants performed the discretionary functions of their respective official duties in an objectively reasonable fashion. Defendants did not transgress any statutory or constitutional rights of Plaintiff that they were aware of in the exercise of their respective professional judgments. Thus, to the extent the district judge finds that a constitutional violation occurred, the undersigned recommends that these Defendants be granted qualified immunity.

D.     "Persons" Under § 1983 and Eleventh Amendment Immunity

Defendants argue that they are employees of SCDC, and "[t]o the extent that they are sued in their official capacity, they are to be treated as the State of South Carolina and are not subject to suit." Defendants also argue that Plaintiff's "the action against the Defendants should be dismissed as a matter of law to the extent that they were sued in their official capacity and while acting in their official capacity they are entitled to Eleventh Amendment Immunity." ECF No. 113-1 at 27-28.

The Supreme Court and the Fourth Circuit have held that suits against state officials acting in their official capacities is a suit against the State. *See Hafer v. Melo*, 502 U.S. 21, 27 (1991); *Weller v. Dept't of Soc. Servs. For Baltimore*, 901 F.2d 387, 398 (4th Cir. 1990). The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be

construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The United States Supreme Court has long held that the Eleventh Amendment also precludes suits against a state by one of its own citizens. *See Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974). This immunity extends not only to suits against a state per se, but also to suits against agents and instrumentalities of the state. *Cash v. Granville Cnty. Bd. of Ed.*, 242 F.3d 219, 222 (4th Cir. 2001). Because Defendants were agents or employees of the State of South Carolina when acting in their official capacities, they are not "persons" within the meaning of 42 U.S.C. § 1983. *Will*, 491 U.S. at 71 ("[N]either a state nor its officials acting in their official capacities are 'persons' under § 1983."); *see also Georgia*, 546 U.S. at 159 (finding that any ADA action against individual Defendants in their official capacities is barred by sovereign immunity). A state cannot, without its consent, be sued in a District Court of the United States by one of its own citizens upon the claim that the case is one that arises under the Constitution and laws of the United States. *Edelman*, 415 U.S. at 663. The State of South Carolina has not consented to be sued in this case. S.C. Code Ann. § 15-78-20(e). As an arm of the State, Defendants, in their official capacities, are immune from suit under the Eleventh Amendment. Accordingly, the undersigned recommends that Plaintiff's claims against Defendants in their official capacities be dismissed.

E.  State Law Claims

In addition to his federal claim, Plaintiff appears to be alleging a state law claim for medical malpractice. Defendants maintain that to the extent Plaintiff is bringing a cause of action under South Carolina state law for gross negligence that it should be dismissed because Plaintiff has failed to assert facts that demonstrate gross negligence. ECF No. 113-1 at 28-30. Defendants

20

also assert any claims related to a breach of the standard of care should be dismissed because Plaintiff has failed to provide expert testimony. *Id.* at 30-31. Defendants contend Plaintiff's state law claims are barred by the South Carolina Tort Claims Act's (SCTCA) two-year Statute of limitations. *Id.* at 32. Finally, Defendants argue that Plaintiff has failed to name the proper parties under SCTCA. *Id.* If the court accepts this Report and Recommendation, the only claims within the court's original jurisdiction will be dismissed. Without Plaintiff's § 1983 claims, Plaintiff's sole remaining cause of action—a purported state law claim for professional malpractice—is based on the court's supplemental jurisdiction. Section 1367(c)(3) of Title 28 of the United States Code provides that the district courts "may decline to exercise supplemental jurisdiction [as to claims forming the same case or controversy as those within the court's original jurisdiction] if the district court has dismissed all claims over which it has original jurisdiction[.]" Trial courts "enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995) (district court did not abuse its discretion in declining to retain jurisdiction over the state law claims); *See also, e.g.*, *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726–27 (1966); *Wauben v. Protega (USA), Inc.*, No. 2:05–2780–PMD–RSC, 2007 WL 775614, at *14 (D.S.C. Mar. 9, 2007) (declining to exercise supplemental jurisdiction over state-law claims upon granting summary judgment as to Title VII claim).

Therefore, the undersigned recommends the court decline to exercise supplemental jurisdiction over Plaintiff's state-law claims and dismiss this matter without prejudice to state-law claims being filed in state court, thus ending the action here.[8]

---

[8] In Defendants' final argument to the court, they maintain that "Plaintiff's Complaint lacks an arguable basis in law and should be dismissed as frivolous under 28 U.S.C. §§ 1915(e)(2)(B)(i),

IV.    Conclusion and Recommendation

Based on the foregoing, it is recommended that Defendants' Motion for Summary Judgment, ECF No. 113, be granted, and that Plaintiff's case against Defendants be dismissed.

IT IS SO RECOMMENDED.

October 23, 2015                                      Kaymani D. West
Florence, South Carolina                             United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

---

1915A(b)(1)(1999)." ECF No. 113-1 at 33. Based on the above analysis, it is unnecessary to address the merits of this argument.